Filed 6/27/24; pub. & mod. order 7/18/24 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| NAHID NASSIRI,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>CITY OF LAFAYETTE, et al.,<br><br>     Defendants and Respondents;<br><br>3721 LAND LLC,<br><br>     Real Party in Interest<br>     and Respondent. | A165324<br><br>(Contra Costa County<br>Super. Ct. No. MSN201971) |

This appeal concerns a proposal by a developer to construct a 12-unit residential condominium building in downtown Lafayette, California on a parcel that is mostly occupied by a vacant convalescent hospital, which is now in disrepair. After a lengthy planning process, the City of Lafayette, the Lafayette City Council, and the Lafayette Planning Department (collectively City) determined that the proposed condominium project was exempt from review under the California Environmental Quality Act (Pub. Resources

1

Code, § 21000 et seq., CEQA) because it qualified as infill development under the CEQA Guidelines. (Cal. Code Regs., tit. 14, § 15332.[1])

Nahid Nassiri, who owns an office building adjacent to the project site, filed a petition for writ of mandate challenging the approval of the project, which the trial court denied. In this appeal, Nassiri argues that the project does not qualify for the infill development exemption because the project site has value as habitat for rare species and because approval of the project would result in significant effects related to air quality. (Guidelines, § 15332, subds. (c) & (d).) Nassiri also makes an argument she did not make in the trial court that the "unusual circumstances" exception applies to the project, so the project does not qualify for the infill development exemption. (*Id.*, § 15300.2, subd. (c).) We find no error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *CEQA Overview*

"CEQA is a comprehensive scheme designed to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game Commission* (1997) 16 Cal.4th 105, 112.) CEQA generally applies to "discretionary projects proposed to be carried out or approved by public agencies." (§ 21080, subd. (a).)

In the first step of the CEQA process, a public agency determines whether a proposed activity is a "project," defined as including any activity that may cause a physical change in the environment and that involves the agency's issuance of a permit, license, or certificate. (§ 21065, subd. (c); Guidelines, § 15378, subd. (a)(3); see *Protect Tustin Ranch v. City of Tustin*

---

[1] All further undesignated statutory references are to the Public Resources Code. We refer to the CEQA Guidelines (Cal. Code Regs., tit. 14, §§ 15000-15387) as the Guidelines.

(2021) 70 Cal.App.5th 951, 959 (*Tustin Ranch*) [outlining the multi-step CEQA process].)

But not every project is subject to CEQA review. If the agency determines that the activity is a "project," it then determines whether the project is exempt from the CEQA review process under a statutory or categorical exemption, such as the categorical exemption in Guideline section 15332 for "infill" development. (*Tustin Ranch*, *supra*, 70 Cal.App.5th at p. 959.) A project qualifying for the infill development exemption must meet these five conditions: "(a) The project is consistent with the applicable general plan designation and . . . policies as well as with applicable zoning designations and regulations. [¶] (b) The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses. [¶] (c) The project site has no value as habitat for endangered, rare or threatened species. [¶] (d) Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality. [¶] (e) The site can be adequately serviced by all required utilities and public services." (Guidelines, § 15332.)

Categorical exemptions themselves are subject to exceptions, including the so-called "unusual circumstances" exception set forth in Guidelines section 15300.2, subdivision (c). A project that is categorically exempt and does not fall within an exception "is not subject to CEQA requirements and 'may be implemented without any CEQA compliance whatsoever.' " (*Association for Protection of Environmental Values v. City of Ukiah* (1991) 2 Cal.App.4th 720.)

B. *Project Application and Review*

In May 2018, 3721 Land LLC (who we will refer to as the developer) applied to the City to demolish a vacant building on Mt. Diablo Boulevard,

3

and construct a new 4-story, 13-unit condominium building (the project). The property on which the vacant building stands is about 0.3 of an acre and relatively flat, with a creek along the southern property line. The existing building takes up most of the site. There are no trees within the proposed building footprint, and the trees adjacent to the creek would remain standing. Commercial buildings flank the property on either side and across Mt. Diablo Boulevard; single-family residences lie beyond the creek to the south.

The developer's application was subjected to an extensive public review process, including two hearings before the Planning Commission and two hearings before the Design Review Commission, at all of which public comment was received.

By the time of the Planning Commission's second meeting, in April 2020, the project had been modified in several respects, including eliminating one of the fourth-floor units, which reduced the project to 12 units.[2] At the April 2020 meeting, the Planning Commission found that the project is exempt from CEQA review as an infill development project under Guidelines section 15332 based on the record before it, which included an August 2019 biological resources report by Mosaic Associates and a February 2020 CEQA exemption memo, both submitted by the developer. The Planning Commission forwarded the project to the City Council with a recommendation to approve the application subject to conditions.

Review of the project continued at a hearing before the City Council on May 11, at which further public comments were received. The City Council continued the matter to June 22 to allow staff to respond to the comments, including written comments submitted by Nassiri, who owns an office

_____

[2] All subsequent dates are in 2020 unless otherwise stated.

4

building adjacent to the site of the proposed project. Through her attorney, Nassiri had retained consultants to opine on the applicability of the infill development exemption, and the consultants' comments were included in her written submission.

The City reviewed the public comments, including further submissions by Nassiri's attorney, and also reviewed further submissions by the developer that included responses to Nassiri's consultants. The City Attorney's Office prepared a memorandum dated June 18, concluding that Nassiri had not provided substantial evidence to support her claim that the project was *not* exempt under the infill development exemption, and further concluding that substantial evidence supported the City's application of the exemption to the project.

On June 22, Nassiri submitted additional comments, including more reports from her consultants. After a public hearing that day, the City Council adopted a resolution finding the project exempt from CEQA and approved the project, subject to conditions.

On July 2, the City filed a Notice of Exemption from CEQA review under Guidelines section 15332. The stated reasons for the exemption include that the proposal is consistent with the general plan, zoning and density bonus regulations; the site "is currently developed with structures and is not known to have any values as habitat for endangered, rare or threatened species"; and "the proposal will not significantly impact . . . air quality." In other words, in the City's view, the conditions for the infill development exemption had been met.

C.  *Proceedings in the Superior Court*

Nassiri first petitioned the Contra Costa Superior Court to stop the project in December 2020. In June 2021, Nassiri filed a First Amended

Verified Petition for Writ of Mandate against the City and the developer, alleging that the City's approval of the project violated CEQA.[3]

After the parties briefed the merits and the trial court held a hearing, the court granted the petition as to Nassiri's CEQA cause of action based on its finding that substantial evidence did not support the City's determination that "[t]he project site has no value, as habitat for endangered, rare or threatened species." The court rejected Nassiri's other CEQA claims, specifically, that the project was inconsistent with the City's general plan and zoning code, that the City's finding that the project would not result in significant effects relating to air quality was not supported by substantial evidence, and that the City's requirement for a pre-construction survey for nesting birds was a mitigation measure that prevented the City from finding the project exempt from CEQA.

The developer filed a motion for new trial, in which the City joined, arguing that in light of *Tustin Ranch*, *supra*, 70 Cal.App.5th at pp. 959-961, which addressed the meaning of "project site" in Guidelines section 15332, subdivision (b), that same term in Guidelines section 15332, subdivision (c), should be properly understood as including only part of the 0.3 acre on which the project would be located. The developer argued that the only potential habitat for rare birds on the parcel was an area that was not part of the "project site" under *Tustin Ranch*, because no demolition or construction activities would occur in that area. Therefore, according to the developer, substantial evidence supported the City's determination that "[t]he project

---

[3] The petition also alleged violation of the California Density Bonus Law (Gov. Code, § 65915), and the City's story pole requirement. Nassiri does not challenge the trial court's denial of her petition with respect to those causes of action, and we do not discuss them further.

6

site has no value as habitat for endangered, rare or threatened species" under Guidelines section 15332, subdivision (c).

The trial court granted the motion for new trial based on its finding that there was substantial evidence in the record that the "project site" as properly understood did not include the portion of the parcel where rare birds were located.

Judgment was thus entered denying Nassiri's petition, and this appeal timely followed.[4]

## DISCUSSION

### A. *Standard of Review*

Our review of an agency's determination that a project falls within a categorical exemption from CEQA review "extend[s] only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5; see *Tustin Ranch*, *supra*, 70 Cal.App.5th at p. 960 [discussing standard of review].)

We review the agency's action, not the decision of the trial court; accordingly, we "independently determine[ ] whether the record 'demonstrates any legal error' by the agency and deferentially consider[ ] whether the record 'contains substantial evidence to support [the agency's] factual determinations.' " (*Protecting Our Water and Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495.) Thus, we

---

[4] The City filed a respondent's brief in this court, but the developer did not. A few weeks before the extended deadline for filing, the developer's counsel filed an unopposed motion for leave to withdraw as counsel, which we granted.

review the City's factual determination that the project falls within the infill development exemption for substantial evidence. To the extent our review requires us to interpret the language of the exemption, we do so independently under the de novo standard of review. (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 268 & fn. 16 (*Banker's Hill*).) In substantial evidence review, "we simply review the record to determine whether substantial evidence supports the City's findings as to [the] elements" of the exemption. (*Id.* at p. 268.) "We do not weigh conflicting evidence, as that is the role of the public agency. [Citation.] Rather, we review the administrative record to see if it contains evidence of ponderable legal significance that is reasonable in nature, credible, and of solid value, to support the agency's decision." (*Tustin Ranch, supra*, 70 Cal.App.5th at p. 960.) We resolve conflicts in the evidence in favor of the prevailing party, and make "all legitimate and reasonable inferences . . . to support the agency's decision. [Citation.] When two or more inferences can reasonably be deduced from the evidence, we cannot substitute our deductions for those of the agency." (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 410 (*Holden*).) If substantial evidence in the record supports the City's finding, "we will uphold the City's determination, even if other evidence arguably supports a different conclusion." (*Banker's Hill, supra*, 139 Cal.App.4th at p. 269.)[5]

---

[5] Nassiri has requested we take judicial notice of two documents that postdate the City's action that is under review. We deny the request because the documents are not relevant to our resolution of this appeal. (See *Sweeney v. California Regional Water Quality Control Bd.* (2021) 61 Cal.App.5th 1093, 1118, fn. 3 [denying request for judicial notice of documents that "are unnecessary to resolve the issues before us"]; see also *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 565 [evidence not

B.	*Value as Habitat*

There is no dispute that a portion of the 0.3 acre parcel contains a creek, with adjacent trees, which runs along the southern property line. Nassiri argues that the project does not qualify for the infill development exemption because the "creek area" of the parcel (that is, the creek and the adjacent trees) is part of the project site and has value as habitat for two species of birds:  oak titmouse and Nuttall's woodpecker.  Nassiri argues that these species qualify as "rare" under CEQA because they have been listed by the United States Fish and Wildlife Service as "Bird Species of Conservation Concern."

The City argues that substantial evidence supports its finding that the parcel on which the project would be built has no value as habitat for rare species, and that in any event, applying the holding of *Tustin Ranch*, *supra*, 70 Cal.App.5th at pages 960-961, the "creek area" is not part of the project site because no development or construction-related activity will take place there.

1.	*Applicable Law*

As we have described, the infill development exemption requires that "[t]he project site has no value as habitat for endangered, rare or threatened species."  (Guidelines, § 15332, subd. (c).)

A species is "rare" under the Guidelines "when either:  [¶] (A) Although not presently threatened with extinction, the species is existing in such small numbers throughout all or a significant portion of its range that it may become endangered if its environment worsens; or [¶] (B) The species is likely to become endangered within the foreseeable future throughout all or a

contained in the administrative record is generally inadmissible in actions brought under section 21168.5].)

9

significant portion of its range and may be considered 'threatened' as that term is used in the Federal Endangered Species Act."[6] (Guidelines, § 15380, subd. (b)(2).)

A species is "endangered" under the Guidelines "when its survival and reproduction in the wild are in immediate jeopardy." (Guidelines, § 15380, subd. (b)(1).)

We note that the Guidelines state that a species is *presumed* to be endangered, rare or threatened if it is listed in specified sections of the California Code of Regulations or in specified sections of the Code of Federal Regulations under the federal Endangered Species Act. (Guidelines, § 15380, subd. (c).) Nassiri properly does not contend that the oak titmouse or Nuttall's woodpecker are listed species under Guidelines section 15380, subdivision (c). A species that is not listed is nevertheless considered "rare" if it is shown to meet the criteria in subdivision (b)(2) of Guidelines section 15380, which are set forth above. (*Id.*, § 15380, subd. (d),) The precise issue before us is whether substantial evidence supports the City's finding that the oak titmouse and Nuttall's woodpecker are not "rare" because they do not meet these criteria.

2. *Additional Factual Background*

During the approval process, the developer submitted to the City a report prepared by Judy Bendix of Mosaic Associates (Mosaic). This report assessed the suitability of habitat conditions to support what Bendix called "special-status species" in the "Study Area," defined in the report as

---

[6] A "threatened species" under the federal Endangered Species Act is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." (16 U.S.C. § 1532(20).) An "endangered species" is one "which is in danger of extinction throughout all or a significant portion of its range." (*Id.* § 1532(6).)

encompassing the 0.3 acre parcel on which the project would be constructed. Bendix defined "special-status species" to include species listed under the federal or state Endangered Species Acts as rare, threatened or endangered and all candidates for listing, as well as species on other lists prepared by federal and state agencies, and concluded that "[d]ue to the absence of suitable habitat" in the Study Area only one of the species that she considered "special-status" had the potential to occupy the site. That species, the Cooper's hawk, is not at issue in this appeal.[7] Bendix noted that she had observed oak titmouse and Nuttall's woodpecker during her site visit.

In a report that Nassiri's counsel submitted to the City on May 8, Shawn Smallwood, a biologist hired for Nassiri, stated that he had observed oak titmouse and Nuttall's woodpecker during a visit to the site, and he regarded both as "special-status species" because they have been listed as Bird Species of Conservation Concern by the U.S. Fish and Wildlife Service.[8] Smallwood concluded that "[t]he project site provides habitat value for

---

[7] Neither of the experts who opined on bird species (Bendix for the developer and Shawn Smallwood for Nassiri) reported any observation of Cooper's hawk during their site visits. Bendix opined that there is suitable nesting habitat for Cooper's hawk and other birds "in and near the Study Area," but that birds and their nests would be protected by the requirement that if "site disturbance for the proposed project" begins during nesting season, a nesting survey would be conducted, and a "no disturbance buffer" zone would be established surrounding any nests that were detected. Nassiri's opening brief makes no reference to the Cooper's hawk, and we do not discuss that species further.

[8] "Bird Species of Conservation Concern" are species of "migratory nongame birds that, without additional conservation actions, are likely to become candidates for listing under the [federal] Endangered Species Act." (16 U.S.C. § 2912(a)(3).)

11

special-status species of wildlife," and that "a reasonable argument can be made for the need to prepare an Environmental Impact Report."

The developer then submitted to the City a response from Bendix to Smallwood's report. Bendix acknowledged that oak titmouse and Nuttall's woodpecker are "Bird Species of Conservation Concern," but stated that the birds were not "rare." She concluded that the project site "does not have value for species listed under the federal or state Endangered Species Acts, nor does it have habitat value for species that are rare or unique to the region."

On June 22, Nassiri's counsel submitted a reply from Smallwood in response. Smallwood opined that special-status species (which he defines as including Bird Species of Conservation Concern), "are by definition rare, sensitive, or declining in number or geographic range, so their presence disqualifies the in-fill exemption," and concluded that "[a] fair argument can be made for the need to prepare an [Environmental Impact Report] to assess impacts and formulate mitigation for the proposed project."

At the June 22 City Council meeting, Bendix, speaking in support of the developer's application to demolish the convalescent hospital and build the residential condominiums, stated that she stood by her conclusion that the project site does not have value as habitat for species listed under the federal or state Endangered Species Acts, or for any species that are rare or unique to the region. She reported that she had consulted additional sources as to the classification of the oak titmouse and Nuttall's woodpecker, which she had previously characterized as "locally and regionally abundant" and as birds that "would [not] be considered rare," and that the Cornell University Laboratory of Ornithology classified them as "least concerned species." She also stated that she had reviewed the definition of "rare" in Guidelines

12

section 15380, including the part of the definition referring to species that "exist[ ] in such small numbers throughout all or a significant portion of its range that it may become endangered if its environment worsens" (Guidelines, § 15380, subd. (b)(2)(A)), and opined that under the definition of "rare" in the Guidelines, the site does not provide habitat value for any rare species.

　　3.　*Analysis*

In concluding that the conditions for the infill development exemption to CEQA review had been met, the City found that the project site was not known to have any value as habitat for rare species. (Guidelines § 15332, subd. (c).) We conclude substantial evidence supports this finding.

To begin, there is no dispute that oak titmouse and Nuttall's woodpecker were observed on the parcel where the proposed project would be located, and that these birds are listed as Bird Species of Conservation Concern by the U.S. Fish and Wildlife Service. We will assume without deciding that their presence means that the parcel has some value as habitat for those species. Bird Species of Conservation Concern are species "that, without additional conservation actions, are likely to become *candidates* for listing under the Endangered Species Act." (16 U.S.C. § 2912(a)(3), italics added.) Quoting from Guidelines section 15380, subdivision (b)(2)(A), Nassiri contends that a Bird Species of Conservation Concern is "rare" for purposes of CEQA because the species " 'may become endangered if [their] environment worsens.' "[9] But Nassiri quotes just a portion of subdivision (b)(2)(A). Nassiri

_____

[9] Recall that Guidelines section 15380, subdivision (b)(2) establishes two alternative definitions for "rare," one in subdivision (b)(2)(A) and the other in (b)(2)(B). Nassiri does not contend that Bird Species of Conservation Concern are "rare" under section 15380, subdivision (b)(2)(B), which states that a species is "rare" for purposes of CEQA if it "is likely to become

13

provides no authority or legal analysis to support her claim that a species that is "likely to become [a] *candidate*[ ] for listing under the Endangered Species Act" in the absence of additional conservation actions (16 U.S.C. § 2912(a)(3), italics added) is necessarily a species that currently "*exists in such small numbers throughout all or a significant portion of its range* that it may become *endangered* if its environment worsens" for purposes of CEQA.[10] (Guidelines, § 15380, subd. (b)(2)(A), italics added.)  Nor does Nassiri point to anything in the administrative record that addresses whether oak titmouse or Nuttall's woodpecker exist in such small numbers in all or a significant portion of their ranges that they may become "endangered" if their environments worsen and are therefore "rare" for purposes of the Guidelines section 15380, subdivision (b)(2)(A), which defines "rare," or section 15332, subdivision (c), which provides that the infill development exemption applies only if the project site has no habitat value for "rare" species.

The question, then, is whether there is substantial evidence in the administrative record to support the City's finding that these two bird species are not "rare" for purposes of the Guidelines.  Bendix's reports and statement to the City Council conclude that, although oak titmouse and Nuttall's woodpecker had been observed at the parcel where the project would be built, the parcel did not have habitat value for "rare" species, as that term is defined in the Guidelines.  Because there is substantial evidence in the record to support the City's finding, we uphold it, even if there is evidence that

---

endangered within the foreseeable future throughout all or a significant portion of its range and may be considered 'threatened' as that term is used in the Federal Endangered Species Act."

[10] As we have noted, under CEQA a species is "endangered" "when its survival and reproduction in the wild are in *immediate* jeopardy." (Guidelines, § 15380, subd. (b)(1), italics added.)

14

supports a different conclusion. (*Banker's Hill*, *supra*, 139 Cal.App.4th at p. 269.)

We note that Nassiri's expert, Smallwood, never discussed the definition of "rare" in the Guidelines and never asserted that oak titmouse and Nuttall's woodpecker are "rare" under Guidelines section 15380, subdivision (b)(2). He opined only that the project site provided habitat value for "special-status species," that the species he considers to be special-status species, including Bird Species of Conservation Concern are necessarily "rare, sensitive, *or* declining in number or geographic range," and that therefore "their presence disqualifies the in-fill exemption." (Italics added.) But he did not opine that the fact that a species is "sensitive" or "declining in number or geographic range" means that the species is "rare" as that term is defined in Guidelines section 15380, subdivision (b). Even if he had done so, his opinion would have simply been evidence that the City could weigh against Bendix's opinion in determining whether the parcel had habitat value for rare species, and we must resolve all conflicts in the evidence in favor of the City, as the prevailing party.[11] (*Holden*, *supra*, 43 Cal.App.5th at p. 410.)

_____

[11] Smallwood criticized what he characterized as Bendix's position that a special-status species must be "rare within a region before its presence at a site disqualifies the in-fill exemption," and Nassiri adopts his criticism in her brief. The characterization is not strictly accurate. Bendix stated more than once that the site had no habitat value "for species that are rare or unique to the region." Even if "to the region" in Bendix's phrase could be understood as modifying both "rare" and "unique" (so that the statement could be read as referring to "species that are rare to the region, or species that are unique to the region,") that is not the only way to interpret her statement. Her statement can also be understood as referring to "rare species, or species that are unique to the region." Thus the City was not required to conclude that Bendix claimed a species must be "rare within [the] region [of the project]" to count as "rare" for the Guidelines. In any event, at the June 22 City Council

15

Finally, because we conclude that substantial evidence supports the City's finding that the parcel on which the project would be constructed has no value as habitat for rare species, we need not reach the City's argument that because no construction or development activity would occur in the "creek area" (that is in the creek along the southern property line or among the adjacent trees), under the holding of *Tustin Ranch*, *supra*, 70 Cal.App.5th 951, the "creek area" is not part of the "project site." In any event, the facts of *Tustin Ranch* are completely different from the facts here, and that case has no bearing on this one.

*Tustin Ranch* concerned the development of a gas station within a large shopping center. (70 Cal.App.5th at p. 955.) After the city of Tustin concluded that the project was exempt from CEQA under the infill development exemption, a writ petition was filed challenging the approval based in part on a claim that the project site was too large to qualify for the exemption, which applies only if the "project site" is no larger than five acres.[12] (*Id.* at p. 958.) The trial court denied the petition, and the Court of Appeal affirmed. (*Id.* at p. 956.) In *Tustin Ranch*, the claim that the project was too large to qualify for the infill exemption rested on the fact that some initial project documents described the project site as encompassing nearly 12

_____

hearing, Bendix stated unambiguously that in her view the site did not have habitat value for any "rare" species as the term is defined in the Guidelines.

[12] The requirement that the "project site" be no more than five acres is set forth in subdivision (b) of Guidelines section 15332. That subdivision is not at issue in the case before us, but the habitat provision in subdivision (c) of that section also includes the phrase "project site." We assume the phrase has the same meaning in both subdivisions of the regulation. (See *Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 979 ["words or phrases given a particular meaning in one part of a statute must be given the same meaning in other parts of the statute"].)

16

acres. (*Id.* at p. 960.) But other documents made clear that although the total size of the existing shopping center was about 12 acres, the size of the "project site" was 2.38 acres: only 2.38 acres would be altered by the project, and " '[n]o new development or construction activity related to the proposed project [would] occur in the other portions of the shopping center.' " (*Id.* at pp. 960-961.)

Notably, in *Tustin Ranch*, "[m]ultiple documents" confirmed that the size of the project site was 2.38 acres, including a revised development application form, an environmental assessment form, technical documents, and maps. (70 Cal.App.5th at p. 960.) And comments by City staff made while the City Council was considering the matter "clarif[ied] the total project site acreage was calculated by adding together the acreage of the project's two components—1.74 acres where the gas station and ancillary facilities will be built, and 0.64 acres which will include demolition of the existing [building] and development of the new surface parking spaces." (*Ibid.*) In our case, in contrast, the documents consistently describe the project site for the residential condominiums as coterminous with the parcel; and there is no dispute that the parcel includes the "creek area."[13] And the City's resolution approving the condominium project states, "[t]he project site is an existing

_____

[13] For example, the developer's density bonus application states that "[t]his project site consists of .30 acres net land," and the developer's expert Milani describes the project site as "located at 3721 Mt. Diablo Boulevard," as "consist[ing] of a single parcel identified as [parcel number]," and as "approximately rectangular in shape and occupy[ing] about 0.3 acres." City staff reports to the City Council stated: "The site contains a creek along the southern property line . . . [and] is almost completely covered with existing development, with the [existing] building taking up the majority of the site. The property is ~0.30 acres."

parcel with access to Mt. Diablo Blvd" and "[t]he site contains few natural features other than the creek at the rear given it[s] former development."

In short, under *Tustin Ranch*, for purposes of calculating the required five-acre maximum project site size for the infill development exemption, an agency can properly consider a "project site" to be part of an existing parcel, so long as development and construction activity are confined to that part of the parcel and no other part of the parcel is being altered by the project. (70 Cal.App.5th at pp. 960-961.) But here, unlike in *Tustin Ranch*, there is nothing to suggest that the City considered the project site to be just part of the parcel. In particular, nothing suggests that the City considered the project site to exclude the "creek area."

C.  *Significant Effect Relating to Air Quality*

We next turn to Nassiri's argument that the City lacked substantial evidence to conclude that the project would not result in a significant effect related to air quality, another one of the criteria that must be satisfied before the City can find that CEQA's infill development exemption applies to this project. (Guidelines, § 15332, subd. (d).) Nassiri argues that a health risk assessment prepared by retained experts at an environmental consulting firm constitutes expert evidence of significant air quality impacts from diesel particulate matter, and that because the assessment was not rebutted by any expert, the City could not conclude that the requirements of the infill exemption had been met. We find no merit to this argument.

1.  *Additional Factual Background*

Nassiri's counsel submitted a report to the City on May 8 from Soil Water Air Protection Enterprise (a consulting firm referred to by the parties as SWAPE). The report stated that the proposed project will produce emissions of diesel particulate matter (DPM), a human carcinogen, through

18

the exhaust stacks of construction equipment and through exhaust from the vehicle and truck trips that would occur after construction over the years while the project was "in operation," presumably meaning when it was a completed and occupied 12-unit residential condominium building. SWAPE did *not* contend that the DPM emissions from construction or operation would exceed the thresholds established by the Bay Area Air Quality Management District (BAAQMD).[14] Rather, SWAPE stated that in view of recommendations from the state's Office of Environmental Health Hazard Assessment that projects lasting at least two months be evaluated for cancer risks, a health risk assessment should be performed to compare the excess health risk associated with the DPM emissions project to the threshold of 10 in one million adopted by the BAAQMD. SWAPE did not represent that there was any statutory or regulatory requirement to prepare a health risk assessment for the project. But nonetheless SWAPE prepared what it characterized as "a simple screening-level" health risk assessment, and stated that its analysis "demonstrates that the [p]roject's air quality and health risks impacts may be potentially significant."

SWAPE reported that it prepared a "CalEEMod" model for the project that estimated the total amount of DPM emissions associated with the construction and subsequent "operation" of the project as residential condominiums. SWAPE used the output of its model as the basis for

---

[14] In contrast, at one point SWAPE asserted that the project's construction-related emissions of VOC (volatile organic compounds) and NOx (nitrogen oxides) *would* exceed BAAQMD thresholds. SWAPE later acknowledged that modeling by the developer's expert, which was based on actual project characteristics, showed that VOC and NOx emissions would be below the BAAQMD thresholds. VOC and NOx emissions are not at issue on appeal.

19

calculations to estimate average DPM emission rates during construction and operation, and used those estimated emissions rates in a screening model recommended by the United States Environmental Protection Agency (U.S. EPA), "AERSCREEN," to generate "maximum reasonable estimates of single-hour DPM concentrations from the project site" at particular points in the vicinity of the site. From those concentrations, SWAPE calculated that the increased cancer risk to the "maximally exposed individual resident" over the course of project construction and operation exceeded the BAAQMD threshold. SWAPE stated that although its screening analysis "is known to be conservative and tends to err on the side of health protection," the analysis "demonstrates that construction and operation of the [p]roject could result in a potentially significant health risk impact." In other words, there could be a potentially significant health risk impact from building and operating the condominium project on this downtown site adjacent to Nassiri's office building.

The developer's air quality consultant, Mark Milani of Milani & Associates, responded to SWAPE's analysis, stating that SWAPE's CalEEMod modeling did not reflect the construction conditions and emissions sources associated with the project. Milani prepared a CalEEMod model using project- and site-specific information, attached the output from the model to his response dated June 8, and stated that based on the modeling results, the project "will [ ] not result in any significant air quality effects . . . from construction emissions." Milani did not specifically address SWAPE's health risk assessment.

SWAPE's reply to Milani's analysis, dated June 22, was submitted to the City that same day. For purposes of the health risk assessment, SWAPE revised the input to the AERSCREEN model using the DPM emissions

output from Milani's CalEEMod model run, rather than the output of its own CalEEMod model run, which Milani had criticized. SWAPE reported that even with these revised inputs, it calculated increased cancer risk over the course of project construction and operation that exceeded the BAAQMD threshold of 10 in one million, "thus resulting in a potentially significant impact."

At the June 22 City Council meeting, Milani stated that because the site was "very narrow and small," the excavation would be done with one excavator that would be stationary and a bobcat that would move at two-to-three miles per hour to pick up small loads from the excavator and drop them off at trucks that would come to the site. He concluded that there was "much less impact from what SWAPE is saying in terms of" diesel emissions from the site.

2.    *Analysis*

The question before us is whether the administrative record contains substantial evidence to support the City's finding that "[a]pproval of the project would not result in any significant effects relating to . . . air quality." (Guidelines, § 15332, subd. (d).) We conclude that it does in the form of Milani's report stating that an analysis of emissions based on project-specific data shows that the project will not result in any significant air quality effects associated with construction emissions.

As an initial matter, and contrary to Nassiri's assertion, it is not at all clear that SWAPE's health risk assessment (on which Nassiri relies to argue that the City's determination is not supported by substantial evidence) constitutes evidence that the project "would result" in significant effects related to air quality. SWAPE's reports by their own terms conclude that the project "may" result in impacts on the surrounding environment and that the

21

project "*could* result in a potentially significant . . . impact." (Italics added.) The differences are important: the infill development exemption at issue here "does not depend on whether a project *may* have a significant effect, but instead depends on if it *will* have a significant effect." (*Banker's Hill, supra*, 139 Cal.App.4th at p. 269.)

In any event, the City argues on appeal that even though SWAPE's June 22 analysis uses Milani's CalEEMod model output data as input to the AERSCREEN analysis, SWAPE's health risk assessment does not reflect the characteristics of the project, and that because SWAPE's analysis does not concern the actual project, it is based on "inherently improbable, and therefore not credible, data," and does not constitute substantial evidence of a potential significant effect. (See *Brentwood Assn. for No Drilling, Inc. v. City of Los Angeles* (1982) 134 Cal.App.3d 491, 504 (*Brentwood*) [agency may disregard even uncontradicted testimony "if it is inherently improbable" and "may reject an opinion if it is unsupported by the facts from which it is derived"].)

The City identifies "misstatements and errors" in SWAPE's analysis, and claims that given these misstatements, the evidence presented by SWAPE is "clearly inaccurate or erroneous" and is therefore not substantial evidence. (§ 21080, subd. (e)(2).) Although we do not find the City's entire argument to be convincing, we are persuaded that SWAPE's June 22 report does not accurately reflect the scope of construction of the proposed project and therefore does not constitute substantial evidence of the effect of approving the project.

We begin with the part of the City's argument that we find persuasive. The City observes that although SWAPE's health risk assessment used Milani's estimate of total DPM emissions during the construction period, the

22

AERSCREEN model on which SWAPE based its health risk assessment assumed a constant rate of emissions, 24 hours per day throughout the entire 171-day period from beginning to end of construction. The City argues that this does not accurately reflect the construction of the project, because construction would not occur 24 hours a day or on weekends (so the total number of days on which emissions are produced would be fewer), and because the highest level of emissions would occur only during a *five-day* phase of the construction, not during the entire construction period. Nassiri responds that the AERSCREEN model, which is recommended by the U.S. EPA, requires the entry of an emission rate; that there is nothing erroneous or inaccurate in calculating an average rate over the entire construction period; and that SWAPE was simply following the U.S. EPA's recommended methodology. But the fundamental issue raised by the City is that there is no evidence that SWAPE's analysis, which is based on an estimated constant rate of DPM emissions over a period of almost six months, provides an accurate representation of the effect of emissions from this project, when there is unrefuted evidence that the emissions will not be constant. In the absence of any showing that a model based on inaccurate assumptions about project construction nevertheless provides an accurate estimate of health risks from the construction of the project, SWAPE's report is not substantial evidence that approving the project will have a significant effect relating to air quality.

The City also claims that SWAPE's assertions about cancer risk from DPM emissions during operation of the project are erroneous because "they presume continuing construction emissions coming from a [p]roject that . . . would have already been constructed and occupied, and offer no evidence to support their estimate." The City's argument on this point is not persuasive,

23

because it disregards SWAPE's statement that its estimate of annual DPM emissions after construction was completed was taken from Milani's model output, and further states that its calculations assume that exposure to DPM from operations would occur "*after* [p]roject construction." (Italics added.) But the fact remains that SWAPE's conclusion about excess cancer risk pertains to "the course of [p]roject construction and operation." Because the conclusion rests on incorrect assumptions about construction, the analysis does not concern the actual project, and therefore does not constitute substantial evidence of a significant effect relating to air quality in the form of DPM emissions.

In sum, we conclude that SWAPE's health risk assessment does not constitute substantial evidence of a significant effect relating to air quality from approval of the project, and the City could disregard it. (*Brentwood*, *supra*, 134 Cal.App.3d at p. 504.)

D.    *The "Unusual Circumstances" Exception*

1.    *Applicable Law*

The "unusual circumstances" exception provides that a categorical exemption from the provisions of CEQA, such as the infill development exemption, "shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (§ 15300.2, subd. (c).)

Our Supreme Court has explained that the unusual circumstances exception "require[s] findings of *both* unusual circumstances *and* a potentially significant effect." (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1115 (*Berkeley Hillside*).) For a project that meets the requirements of a categorical exemption, like the 12-unit residential condominium project here, a party challenging the exemption has

the burden to produce evidence supporting the unusual circumstances exception. (*Id.* at p. 1105.) That burden can be met in one of two ways. First, the party can establish an unusual circumstance "by showing that the project has some feature that distinguishes it from others in the exempt class," and then show that the exception applies by "show[ing] a *reasonable possibility* of a significant effect due to that unusual circumstance." (*Ibid.*, italics added.) Alternatively, the party can "establish an unusual circumstance with evidence that the project *will* have a significant environmental effect," because such evidence, "if convincing, necessarily also establishes 'a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances.' (Guidelines, § 15300.2, subd. (c).)" (*Ibid.*, italics added.)

2.    *Additional Factual Background*

Nassiri raised the unusual circumstances exception during the administrative process in written comments stating that the City was not authorized to apply any exemption to the project because "the Project will have significant adverse biological impacts due to unusual circumstances. The 'unusual circumstances' are the presence of a creek along the south edge of the Project Site and the proximity to Lafayette Reservoir. As a result of these unusual circumstances, the Project will have adverse impacts on special status species."

The City found that the unusual circumstances exception did not apply under either of the analyses set forth in *Berkeley Hillside*. As to the first, the City cited resolutions approving three other projects located near a creek under an infill exemption as substantial evidence that there was no unusual circumstance here. As to the second, the City cited the biological resource analysis provided by Mosaic Associates (the developer's biological consultant)

25

as substantial evidence that the project will not have a significant effect on special status species.

Nassiri's amended petition for writ of mandate alleged that the City abused its discretion by exempting the project from CEQA review "despite the Project's impacts due to 'unusual circumstances' presented by the [ ] creek along the south edge of the Project Site and the Project's proximity to Lafayette reservoir." But in her trial court briefs, Nassiri never argued that the unusual circumstances exception applied to bar the infill development exemption. To the contrary, in a footnote in her reply brief in support of the writ petition, Nassiri stated that the unusual circumstances exception was "irrelevant in the instant case." The trial court did not address the unusual circumstances exception in its tentative rulings; Nassiri did not argue that the exception applied at either of the trial court hearings; and the trial court did not address the exception in its statement of decision or its order granting the motion for new trial.

3.    *Analysis*

As a general rule, "[p]oints that are not properly raised in the trial court are . . . waived on appeal." (*Guardians of Turlock's Integrity v. Turlock City Council* (1983) 149 Cal.App.3d 584, 599 [declining to reach argument that environmental impact report failed to discuss and mitigate cumulative effects, which was not raised in the trial court].) "To allow a litigant to change his theory on appeal is not only unfair to the court but unjust to the opposing litigant." (*Ibid.*) It is within our discretion to reach "an issue not properly raised in the trial court, if it presents a pure question of law on undisputed factual evidence regarding . . . a matter affecting the public interest." (*Vikco Ins. Services, Inc. v. Ohio Indemnity Co.* (1999) 70 Cal.App.4th 55, 67.)

26

Nassiri argues that we should exercise our discretion because impacts to special status species are important issues of public interest; because "the facts are set," by which she means that our review is based solely on the record before the City; and because "whether the City improperly exempted the project from CEQA due to unusual circumstances presents an issue of law." But the applicability of the unusual circumstances exception here presents questions of fact that we review for substantial evidence, rather than a question of law based on undisputed factual evidence. (See, e.g., *Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1114.) ["[w]hether a particular project presents circumstances that are unusual for projects in an exempt class is an essentially factual inquiry"].) This case is not like those on which Nassiri relies. (See *Ryan v. Real Estate of the Pacific, Inc.* (2019) 32 Cal.App.5th 637, 644 [exercising discretion to address whether expert witness is needed to establish scope of duty under a common knowledge]; *Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 712-714 [exercising discretion to address whether environmental documents were adequate as a matter of law]; *Bayside Timber Co. v. Board of Supervisors* (1971) 20 Cal.App.3d 1 [exercising discretion to address constitutionality of Forest Practice Act].)

Almost every CEQA case will involve matters affecting the public interest and an administrative record that has been set. This does not mean that we must allow parties to raise substantial evidence arguments for the first time on appeal. The question whether the City erred in finding that the unusual circumstances exception applied could have been raised as part of Nassiri's trial court challenge to the City's determination, but was not. We decline to reach the issue here.

27

## DISPOSITION

The judgment is affirmed.  Respondents shall recover any costs on appeal.

_____
Miller, J.

WE CONCUR:

_____
Stewart, P. J.

_____
Desautels, J.

A165324, *Nassiri v. City of Lafayette, et al.*

28

Filed 7/18/24 after opinion filed 6/27/24
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| NAHID NASSIRI,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF LAFAYETTE, et al.,<br><br>    Defendants and Respondents;<br><br>3721 LAND LLC,<br><br>    Real Party in Interest<br>    and Respondent. | A165324<br><br>(Contra Costa County<br>Super. Ct. No. MSN201971)<br><br>ORDER GRANTING PUBLICATION<br>AND MODIFYING OPINION |

BY THE COURT:

The opinion in the above-entitled matter filed on June 27, 2024, was not certified for publication in the Official Reports. For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

It is also ordered that the opinion filed herein on June 27, 2024, be modified as follows:

On page 1, in the third line of text, delete the words "which is".

On page 4, in the second to last line of the first full paragraph, delete the words "all of".

On pages 14 and 15, revise the sentence that runs from the end of page 14 to the top of page 15 to read as follows: "Because this is substantial

1

evidence in the record to support the City's finding, we uphold the finding, whether or not there is evidence that supports a different conclusion."

On page 16, in the last sentence of first paragraph, replace the words "In any event" with "But".

This modification does not change the judgment.


Dated:_____          _____
                                       Stewart, P. J.

A165324, *Nassiri v. City of Lafayette et al.*

Court: Contra Costa County Superior Court

Trial Judge: Hon. Edward G. Weil

Lozeau Drury, Richard Drury, Brian B. Flynn, for Plaintiff and Appellant

Best Best & Krieger, Sarah E. Owsowitz, Hannah S. Park, for Defendants and Respondents City of Lafayette, Lafayette City Council, Lafayette Planning Department

A165324, *Nassiri v. City of Lafayette, et al.*